```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
HBC SOLUTIONS, INC.,                                              :
                                                                  :
                              Petitioner,                         :      13-CV-6327 (JMF)
                                                                  :
           -v-                                                    :      MEMORANDUM OPINION
                                                                  :          AND ORDER
HARRIS CORPORATION,                                               :
                                                                  :
                              Respondent.                         :
                                                                  :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/18/2014

JESSE M. FURMAN, United States District Judge:

Petitioner HBC Solutions, Inc. ("HBC") brings this suit, pursuant to Title 9, United States Code, Sections 4 and 206, to compel Respondent Harris Corporation ("Harris") to arbitrate a dispute regarding the price HBC paid for a part of Harris's business comprising assets in the United States and twenty-three foreign jurisdictions. (Am. Pet. To Compel Arbitration (Docket No. 23) ("Am. Pet.") ¶¶ 1-2, 16). Harris moves to dismiss the Amended Petition, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the ground that the Court lacks subject-matter jurisdiction. (Docket No. 26). For the reasons stated below, Harris's motion is DENIED.

## BACKGROUND

This litigation arises from HBC's purchase of Harris's former Broadcast Communications Division (the "Business"), which designs and sells multimedia equipment and services. (*See* Am. Pet. ¶ 22). The purchase was memorialized on December 5, 2012, in an Asset Sale Agreement (the "Sale Agreement"). (Decl. Shahriyar Rahmati Supp. Pet. To Compel Arbitration (Docket No. 4) ("First Rahmati Decl."), Ex. A). As reflected in that Agreement, the Business "consist[ed] of assets held by [Harris] and its Subsidiaries in various countries and

territories" and undertook "global operations." (Sale Agreement at 1-2 (including definition of "Business")). Harris, a Delaware corporation, executed the Sale Agreement on its own behalf and on behalf of at least eleven foreign "Asset Sellers" and "Stock Sellers." (*See id.* at 1, Schedules A-D; Am. Pet. ¶¶ 15, 17. Overall, the transaction involved the sale of fifteen foreign companies and transfer of assets in twenty-three foreign jurisdictions (Am. Pet. ¶ 16).[1]

The parties agreed that the purchase price for the transaction would be finalized post-closing and that HBC's initial payment would be based on estimates. (Sale Agreement §§ 3.1-3.4). More specifically, Section 3.3 of the Sale Agreement provided for a "Purchase Price Adjustment" procedure, involving a two-step accounting of three key categories of assets and liabilities in the transaction — namely, "Cash," "Closing Indebtedness," and "Closing Working Capital." (Sale Agreement §§ 3.3(a), (b), & (d); Am. Pet. ¶ 4). To the extent relevant here, the Sale Agreement defined "Closing Indebtedness" as "the aggregate" of all indebtedness "of each Sold Company" — identified in an attached schedule as companies organized under the laws of Argentina, Austria, Brazil, Canada, Cayman Islands, China, Hong Kong, Hungary, India, Ireland, Japan, Mexico, Russia, and Singapore — "and such Sold Companies' Subsidiaries on a consolidated basis" as of the date of the closing. (Sale Agreement 4; *id.*, Schedule D). The Sale Agreement defined "Cash" to mean "the aggregate of all cash and cash equivalents . . . of each

---

[1] Schedule A to the Sale Agreement identifies Harris, other Delaware entities, and various foreign entities as Asset Sellers or Stock Sellers. Schedule B organizes the transfers by jurisdiction, and identifies "Transferred Assets" in Argentina, Australia, Austria, Brazil, Canada, Cayman Islands, China, Columbia, France, Germany, Hong Kong, Hungary, India, Ireland, Italy, Japan, Malaysia, Mexico, Russia, Singapore, Spain, United Arab Emirates, and the United Kingdom that are being sold, in some instances by Harris directly and in other instances by foreign sellers or other subsidiaries. Schedule C lists all of the local transfer documents in those foreign jurisdictions that had to be executed to accomplish the transaction. And Schedule D lists the various distinct companies sold, including companies in, and organized under the laws of, Argentina, Austria, Brazil, Canada, Cayman Islands, China, Hong Kong, Hungary, India, Ireland, Japan, Mexico, Russia, and Singapore.

Transferred Company" — defined, in turn, as "each Sold Company and each Subsidiary of a Sold Company" — "on a consolidated basis" as of the date of closing. (*Id.* at 3, 17).

Under the "Purchase Price Adjustment" procedure, the first step was to take place prior to final consummation of the transaction and required the seller, Harris, to provide HBC with a "Closing Certificate," including estimates of the three key asset categories. (Sale Agreement § 3.3(a); Am. Pet. ¶ 24). After receiving that estimate, HBC had ninety days to deliver to Harris a written notice disputing any aspect of the latter's accounting. (Sale Agreement § 3.3(b)). Upon receipt of such notice, the parties then had thirty days to submit the dispute to an accounting firm (the "Accountant") — Grant Thornton or another mutually agreed-upon, nationally reputed firm — for resolution. (*Id.* § 3.3(c); Am. Pet. ¶ 12). The Sale Agreement provided that, in conducting its review, the Accountant "shall conduct such hearings or hear such presentations by the parties as the Accountant in its sole discretion deems necessary." (Sale Agreement § 3.2(d)(viii)). It further specified that, once a dispute was submitted, the Accountant had thirty days to issue an "Adjustment Report" detailing the "Adjustment Amount" — the amount to be added or subtracted from the initial price paid to account for the final value of the three categories of assets and liabilities adjusted after closing. (*Id.* § 3.3(d)-(f)). The Sale Agreement provided that the Adjustment Report "shall be final and binding on the parties, absent arithmetical error, and shall be deemed a final arbitration award that is enforceable against each of the parties hereto in any court of competent jurisdiction." (*Id.* § 3.3(d)).

In this case, the Purchase Price Adjustment procedure did not succeed in resolving the parties' disagreements as planned. Prior to closing, the parties estimated that the purchase price would be $164,163,157. (*See* Am. Pet. ¶¶ 23, 27). On May 3, 2013, Harris submitted to HBC its Closing Certificate, which proposed a final purchase price of $145,428,697, reflecting a

downward adjustment of $18,734,460 from the pre-closing total. (*Id.* ¶ 27; First Rahmati Decl., Ex. B). On August 1, 2013, HBC submitted a formal dispute notice, which calculated the purchase price to be only $64,270,487. (Am. Pet. ¶ 28; First Rahmati Decl., Ex. C). Rather than submit the dispute to the Accountant within the contractually specified thirty-day period, however, Harris wrote a series of letters to HBC objecting to the latter's dispute notice. (Am. Pet. ¶ 29; First Rahmati Decl., Exs. D, E). Harris argued that HBC's disputes concerned the appropriateness of various accounting principles, rather than the consistency with which those principles were applied to the balance sheet of the Business, and thus went beyond the jurisdiction of the Accountant under the Agreement. (First Rahmati Decl., Exs. D, E).

On September 9, 2013, HBC filed its initial Petition in this case, which sought to compel Harris to submit the dispute to the Accountant. (Docket No. 1). HBC filed the Amended Petition on October 18, 2013. (Docket No. 23). Harris now moves to dismiss the Amended Petition, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Docket No. 26).

## DISCUSSION

As noted, Harris seeks to dismiss the Petition on the ground that this Court lacks subject-matter jurisdiction. (Mem. Supp. Resp't's Mot. To Dismiss Am. Pet. Lack Subject Matter Jurisdiction (Docket No. 27) ("Resp't Mem.")). Because there is no diversity of citizenship between the parties, and because a petition to compel arbitration does not independently present a federal question, *see, e.g.*, *Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 142 n.4 (2d Cir. 2013), jurisdiction on those bases is plainly lacking. Instead, the sole question at this stage of the case is whether the Court has jurisdiction pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York

Convention"), codified in the United States as Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-208.  (Am. Pet. ¶¶ 10-11).  Harris argues that the New York Convention and the FAA do not apply for two reasons: first, because the legal relationship between the parties is "entirely domestic in scope," (Resp't Mem. 10-17), and, second, because the Purchase Price Adjustment procedure does not qualify as an "arbitration," (Resp't Mem. 17-23).  Both arguments are without merit.

Harris's first argument fails because the legal relationship between the parties — as defined in the Sale Agreement — is sufficiently international to implicate the New York Convention and the FAA.  Section 202 of the FAA provides, in relevant part as follows:

> An agreement or award arising out of . . . a [commercial] relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

Thus, if a party seeks to compel arbitration, as here, jurisdiction is proper under the New York Convention and the FAA only if the legal relationship between the parties is not "entirely domestic in scope." *Smith/Enron Cogeneration Ltd P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 92 (2d Cir. 1999).  The Second Circuit has defined relationships that are "entirely domestic in scope" to mean those that (1) are "between two United States citizens"; (2) "involv[e] property located in the United States"; *and* (3) "ha[ve] no reasonable relationship with one or more foreign states." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (internal quotation marks omitted).

Applying those standards here, Harris's argument falls short.  Although Harris and HBC are both Delaware corporations with principal places of business in the United States, the "relationship" between the parties plainly "involve[d] property located abroad" and "evisage[d]

5

performance . . . abroad," as the Sale Agreement — which defined that relationship — provided for the transfer of a business with "global operations" from Harris and its subsidiaries "in various countries and territories." (Sale Agreement 1-2). Indeed, the transaction involved the sale of fifteen foreign companies and transfer of assets in twenty-three foreign jurisdictions. (Am. Pet. ¶ 16). It follows that the relationship between the parties was not "entirely domestic in scope." *Cf. Lander Co., Inc. v. MMP Invs., Inc.*, 107 F.3d 476, 478-82 (7th Cir. 1997) (finding jurisdiction with respect to a contract to sell products in Poland); *Holzer v. Mondadori*, No. 12-CV-5234 (NRB), 2013 WL 1104269, at *5 (S.D.N.Y. Mar. 14, 2013) (finding jurisdiction with respect to an agreement to purchase real estate in Dubai); *New Avex, Inc. v. Socata Aircraft Inc.*, No. 02-CV-6519 (DLC), 2002 WL 1998193, at *3 (S.D.N.Y. Aug. 29, 2002) (finding jurisdiction with respect to a contract between two American corporations involving the sale of French aircraft in France); *Heather Trading Corp. v. Voest-Alpine Trading U.S.A. Corp.*, Nos. 85-CV-823 (SWK), 85-CV-913 (SWK), 1986 WL 4542, at *2 (S.D.N.Y. April 8, 1986) (finding jurisdiction with respect to a contract to deliver crude oil in Ecuador).

      In arguing otherwise, Harris urges the Court to focus exclusively on the Purchase Price Adjustment process. But that argument finds no support in the plain language of Section 202, which looks to the "relationship" between the parties. In addition, it myopically ignores the fact that the ultimate purpose of the Purchase Price Adjustment process was to resolve any disputes over the purchase price for the transaction as a whole, which, as noted, involved property in more than twenty countries abroad. In any event, even if the Court were to accept Harris's argument, and focus solely on the Purchase Price Adjustment process, its argument would still fail. After all, that process was designed to resolve disagreements over, among other things, "Cash" and "Closing Indebtedness," both of which are expressly defined in the Agreement as the

aggregate of assets belonging to the "Sold Companies" — identified as companies organized under the laws of Argentina, Austria, Brazil, Canada, Cayman Islands, China, Hong Kong, Hungary, India, Ireland, Japan, Mexico, Russia, and Singapore.  That is, even if the analysis were properly limited to the Purchase Price Adjustment process, the "relationship" between the parties would still "involve" property abroad and jurisdiction would be proper.[2]

Harris's second argument — that the Purchase Price Adjustment process — qualifies as an "expert determination" rather than an "arbitration" fails as well.  Although the argument appears to find support in the views of some commentators on what the law should be, *see, e.g.*, J. Brian Casey et al., *Arbitration and the Valuator*, 2007 J. Bus. Valuation 105, 114 (2007), it is squarely foreclosed by the Second Circuit's decision in *Bakoss*.  In that case, the parties entered into an insurance contract providing for benefits to the plaintiff in the event he became "Permanently Totally Disabled."  707 F.3d at 142.  Each party had the right to have the plaintiff examined by the physician of its choice and, in the event of a disagreement between those physicians, a third physician would make a decision "which shall be final and binding."  *Id.*  On appeal, the Court held that the district court had properly exercised subject-matter jurisdiction over the suit.  More specifically, the Court endorsed the district court's reliance on *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825 (2d Cir. 1988), and *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456 (E.D.N.Y. 1985).  In the former, the Second Circuit had "considered the question of whether contractual language 'calling for the

---

[2]   Although Harris emphasizes the fact that the Business prepared consolidated financial statements for the entirety of the period in question (Decl. Matthew G. Bialecki (Docket No. 28)), meaning that the Accountant would not need to examine the balance sheets of any foreign corporations (Resp't Mem. 16-17), that is not enough to deprive the Court of jurisdiction.  In the Court's view, jurisdiction should turn on the substance of the relationship between the parties, not on accounting practices.  Whether or not Harris prepared consolidated financial statements, the property involved in both the transaction generally and the Purchase Price Adjustment process specifically was located both in and out of the United States.

appointment of an independent tax counsel . . . constitute[s] an enforceable arbitration clause' and concluded that it [did] because 'the language clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution.'" *Bakoss*, 707 F.3d at 143 (first alteration in original) (quoting *McDonnell Douglas*, 858 F.2d at 830).  In the latter, "Judge Weinstein noted that under the FAA '[a]n adversary proceeding, submission of evidence, witnesses and cross-examination are not essential elements of arbitration' and held that '[i]f the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration.'"  *Id.* (alterations in original) (quoting *AMF*, 621 F. Supp. at 460).

      This case is materially indistinguishable from *Bakoss*.  Here, as in *Bakoss*, the language of the parties' contract "clearly manifests an intention by the parties" to submit their disputes "to a specified third party for binding resolution."  *Id.* (internal quotation marks omitted).  Specifically, in Section 3.3, the parties agreed to submit certain disputes concerning the purchase price to the Accountant, whose decision — in the form of the Adjustment Report — would "be final and binding on the parties, absent arithmetical error, and . . . be deemed a final arbitration award that is enforceable against each of the parties hereto in any court of competent jurisdiction."  (Sale Agreement § 3.3(d)).  Harris tries to avoid the obvious implications of *Bakoss* by contending that the sole question on appeal in that case was whether federal common law or state law provided the meaning of "arbitration" within the FAA, and that the appellant did not argue that the dispute resolution mechanism was not an arbitration (Reply Mem. Supp. Resp't's Mot. To Dismiss Am. Pet. Lack Subject Matter Jurisdiction (Docket No. 33) 8-9), but that contention does not provide a basis for this Court to ignore the Second Circuit's plain language.  Moreover, the Court expressly held that the district court, applying *McDonnell Douglas* and *AMF*, "properly decided that it had subject-matter jurisdiction."  707 F.3d at 144.

And, of course, the Second Circuit itself would have been without jurisdiction altogether if the district court had erred in treating the dispute-resolution process in that case as an arbitration. Unless and until the Second Circuit indicates otherwise, this Court is bound by the decision in *Bakoss* to conclude that the dispute resolution process in this case qualifies as an "arbitration" for purposes of the FAA.

## CONCLUSION

The Court has considered the remainder of Harris's arguments and finds them without merit.  Accordingly, the motion to dismiss for lack of subject-matter jurisdiction is DENIED.

In light of that, Respondent shall file and serve any opposition to the Amended Petition on the merits by **August 8, 2014**.  Petitioner's reply, if any, shall be filed and served by **August 15, 2014**.  At the time its reply is filed and served, Petitioner shall supply to Chambers two courtesy hard copies of the parties' filings, marked as such, by mailing or delivering them to the Thurgood Marshall Courthouse, 40 Centre Street, Room 2202, New York, New York.

The Clerk of Court is directed to terminate Docket No. 26.

SO ORDERED.

Date: July 18, 2014
      New York, New York

_____
JESSE M. FURMAN
United States District Judge