UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                              :

HBC SOLUTIONS, INC.,                              :

                        Petitioner,            :                  13-CV-6327 (JMF)

                                              :

           -v-                               :             OPINION AND ORDER

                                              :

HARRIS CORPORATION,                         :

                                            :

                       Respondent.          :

                                            :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Petitioner HBC Solutions, Inc. ("HBC") moves, pursuant to Sections 4 and 206 of the

Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 4 and 206, to compel Respondent Harris

Corporation ("Harris") to arbitrate a dispute regarding the price HBC paid for part of Harris's

business (the "Business").  (Am. Pet. To Compel Arbitration (Docket No. 23) ¶¶ 1-2, 16).  HBC

maintains that the disputes are subject to a purchase price dispute resolution process set forth in

the parties' agreement, which requires arbitration before an accountant.  By contrast, Harris

contends that the disputes concern representations and warranties made in the parties' agreement

and are subject to indemnification provisions in the parties' agreement rather than the purchase

price dispute resolution process.  Although the principal disagreement is over who should resolve

the parties' purchase price disputes, more is at stake as Harris's liability under the

indemnification provisions is capped at $17.5 million, whereas there is no limitation on the

adjustments that can be made pursuant to the purchase price dispute resolution process and HBC

is seeking adjustments totaling approximately $100 million.

For the reasons stated below, the Court agrees that the parties' disputes fall within the scope of the purchase price dispute resolution process and are therefore subject to arbitration before an accountant.  Accordingly, HBC's motion to compel arbitration is granted.

## BACKGROUND

The following facts are taken from the pleadings, as well as the declarations submitted in support of, and opposition to, the instant motions.  *See, e.g.*, *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration . . . , the court applies a standard similar to that applicable for a motion for summary judgment.").  The facts are undisputed except where noted, and all inferences are drawn in Defendant's favor.  *See, e.g., Russell v. Mimeo, Inc.*, No. 08-CV-5354 (RJS), 2008 WL 6559743, at *1 (S.D.N.Y. Oct. 29, 2008) (noting that, where a motion to compel arbitration is opposed on the ground that the parties did not agree to arbitrate, the court "should give the opposing party the benefit of all reasonable doubts and inferences that may arise." (internal quotation marks omitted)).

**A.  The Agreement**

In 2012, Harris's owners decided to sell the Business — comprised of assets in the United States and twenty-three foreign jurisdictions — and commenced an auction to do so. (Decl. Lewis A. Schwartz (Docket No. 41) ("Schwartz Decl.") ¶ 2).  Ten parties bid on the Business and, after multiple rounds of bidding, Harris selected HBC over one other finalist based on HBC's offer, which included $160 million in cash, a $15 million subordinated promissory note, and up to $50 in an earn out — approximately $10 million more than the other finalist had offered.  (*Id*. ¶¶ 2-3).  On December 5, 2012, the parties entered into an asset sale agreement, formalizing the outcome of the auction (the "Agreement" or "ASA").  (*Id.*  ¶ 4; Decl. Shahriyar Rahmati Supp. Pet. To Compel Arbitration (Docket No. 4) ("Rahmati Decl."), Ex. A ("ASA")).

The parties largely consummated the transaction on February 4, 2013, referred to in the Agreement as the "Initial Closing Date."  (Schwartz Decl. ¶ 4; ASA § 3.2(a)).

Prior to entering the Agreement, HBC conducted due diligence, based in part on a set of Harris's financial statements, including its 2012 balance sheet, audited annual statements, and unaudited statements for the three months prior to September 28, 2012.  (*See* ASA §§ 4.9, 5.7; Mem. Resp. Opp'n Petitioner's Am. Pet. To Compel Arbitration (Docket No. 40) ("Harris Mem.") 4-5).  In Section 4.9 of the Agreement, Harris represented and warranted that, with limited exceptions not relevant here, its financial statements were "prepared in accordance with the accounting records and policies of [Harris]" and with United States Generally Accepted Accounting Principles ("U.S. GAAP") and "present[ed] fairly in all material respects the assets and liabilities of the Business as of the dates thereof and the results of its operations for the periods then ended."  (ASA § 4.9).

The Agreement fixed the Business's "Target Working Capital" at $123.1 million, and set a gross purchase price of $175 million.  (*Id.* §§ 1.1, 3.1(a)).  As is common in this complex type of transaction, however, the Agreement also included a multi-step process to adjust the purchase price based on the value of the Business's cash, indebtedness, and working capital as of the closing date.  (ASA §§ 3.1, 3.3).  First, under Section 3.1(b) of the Agreement, Harris was required, no later than five business days before the Initial Closing Date, to provide a pre-closing certificate setting forth its good-faith estimates of "Closing Working Capital," "Cash," and "Closing Indebtedness" as of the Initial Closing Date.  (*Id.* § 3.1(b)).  Section 3.1(b) further provided that Harris was to prepare those amounts "in accordance with U.S. GAAP and, to the extent consistent with U.S. GAAP, the accounting principles and methodologies followed by

[Harris] in its preparation of" its financial statements — defined in the Agreement as "the Accounting Principles." (*Id.*; *see also* Harris Mem. 6).

Next, the Agreement provided for a "Purchase Price Adjustment" based upon a post-closing calculation of Closing Working Capital, Cash, and Closing Indebtedness as of the Initial Closing Date. Specifically, pursuant to Section 3.3(a), Harris was required, within ninety days of the Initial Closing Date, to provide HBC with a "Closing Certificate" setting forth its good-faith calculation of those amounts, "prepared in accordance with the Accounting Principles," and — on the basis of those amounts — a proposed "Adjustment Amount." (*See also id.* § 3.3(e)). Under Section 3.3(b), HBC then had ninety days to deliver to Harris a "Dispute Notice," setting forth, "in reasonable detail, each disputed item or amount and the basis for [HBC's] disagreement therewith." The Agreement provides in relevant part that, if any such disagreements are not resolved within thirty days, the parties "shall jointly retain Grant Thornton" — defined as the "Accountant" — "to resolve the issues set forth in the Dispute Notice." (*Id.* § 3.3(c)).

Significantly, Article XI of the Agreement contains a separate set of provisions requiring Harris to indemnify and hold HBC harmless "from and against . . . any misrepresentation, breach, or inaccuracy of any representation or warranty . . . contained in or made pursuant to" the Agreement "or any certificate delivered to" HBC pursuant to the Agreement. (*Id.* § 11.1). Whereas there is no limitation on the size of the adjustments that can be made pursuant to the Purchase Price Adjustment process, Harris's liability under the indemnification provisions is strictly limited. Specifically, to the extent relevant here, Section 11.5(b) of the Agreement provides that Harris is not liable unless actual damages from a breach exceed $1.8 million (and then only for the amount in excess of $1.8 million), and caps Harris's liability at $17.5 million

4

(or 10% of the gross purchase price).  (*Id.* § 11.5(b)(i)-(ii)).  Additionally, any action under the indemnification provisions must be submitted to the exclusive jurisdiction of this Court or a New York State Court in Manhattan and any such action "shall be governed by, and construed and enforced in accordance with, the Laws of the State of New York."  (*Id.* § 13.2).

Section 11.9 of the Agreement explicitly provides that the indemnification remedies set forth in Article XI are the "sole and exclusive remedy for any claims (other than for fraud) made in connection with" the Agreement.  In addition, however, it prominently states that "NOTWITHSTANDING THE FOREGOING, THIS *SECTION 11.9* SHALL NOT OPERATE TO INTERFERE WITH OR IMPEDE THE OPERATION OF THE PROVISIONS HEREOF PROVIDING FOR THE RESOLUTIONS OF CERTAIN DISPUTES BY THE ACCOUNTANT" — that is, pursuant to the Purchase Price Adjustment process set forth in Section 3.3 of the Agreement and described above.  (*Id.* § 11.9; *see also* Resp't's Sur-Reply Opp'n Pet'r's Am. Pet. To Compel Arbitration (Docket No. 50) ("Harris Sur-Reply") 2-3; HBC Solutions, Inc.'s Reply Mem. Further Supp. Am. Pet. To Compel Arbitration (Docket No. 45) ("HBC's Reply Mem.") 11).  Reinforcing this carve out from the indemnification provisions, Section 3.3(g) of the Agreement provides that "[a]ll matters that are the subject of a Dispute Notice shall be conclusively settled between the parties for all purposes of this Agreement (including *Section 11.1*) pursuant to" the Purchase Price Adjustment process (including, if necessary, arbitration before the Accountant), and that "no claim may thereafter be brought under any other provision of this Agreement (including *Section 11.1*) with respect to such matters."

**B.  The Dispute**

In accordance with the process set forth in the Agreement, Harris delivered a pre-closing

certificate to HBC on January 28, 2013, and an amended certificate (by agreement) four days

later.  (Schwartz Decl., Ex. 1).  The certificate calculated the Unadjusted Purchase Price to be

approximately $164 million, based in part on Harris's estimate that the Business's Closing

Working Capital was roughly $110 million.  (*Id.*).  On May 3, 2013, Harris delivered the Closing

Certificate to HBC, calculating Closing Working Capital as only $92 million and proposing a

corresponding downward adjustment to the purchase price of approximately $18.7 million.

(Rahmati Decl., Ex. B).  On August 1, 2013, however, HBC provided Harris with a Dispute

Notice contending that Harris's calculations in the Closing Certificate were "based on a

misapplication of U.S. GAAP and/or Harris accounting policies in conflict with the requirements

of the [Agreement] and the Accounting Principles."  (*Id.*, Ex C, at 1-2).  Whereas Harris

calculated Closing Working Capital as roughly $92 million, HBC contended that the correct

figure was less than $20 million — resulting in a final purchase price of approximately $64

million, more than $100 million less than the initial estimate.  (Rahmati Decl., Ex C, at 1-2).

Although the parties have resolved some of their disagreements, approximately $77

million remains in dispute.  (HBC Solutions Inc.'s Mem. Law Supp. Pet. To Compel Arbitration.

(Docket No. 3) 4-5).  By letter dated August 29, 2013, Harris advised HBC that, in its view, "the

large majority" of the claims in the Dispute Notice — specifically, those concerning U.S. GAAP

and Harris's accounting methods — are not Purchase Price Adjustment disputes subject to

resolution pursuant to Section 3.3 of the Agreement, including arbitration before the Accountant.

(Rahmati Decl., Ex. D).  Instead, Harris maintained — and continues to maintain — that HBC's

objections constitute claims for breach of representations and warranties made in the Agreement,

6

subject to the Agreement's indemnification provisions (and their limitations on liability).  (*Id.*).

On September 9, 2013, HBC commenced this lawsuit.

## LEGAL STANDARDS

The FAA reflects "a strong federal policy favoring arbitration as an alternative means of

dispute resolution." *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d

219, 226 (2d Cir. 2001).  In light of that policy, it is well established that "any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also, e.g.*, *John Hancock Life Ins.*

*Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001) (stating that, even if a dispute's arbitrability proves

to be "ambigu[ous]," a court is "compelled to construe the provision in favor of arbitration").  At

the same time, "arbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Comm'cns*

*Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks omitted); *accord In re Am.*

*Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011)).  That is, arbitration under the

FAA "is a matter of consent," not coercion, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561

U.S. 287, 299 (2010) (internal quotation marks omitted), and courts must ultimately "give effect

to the contractual rights and expectations of the parties," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l*

*Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks omitted).

Where, as in this case, a party unambiguously refuses to arbitrate, a court's role is limited

to determining "(1) whether there exists a valid agreement to arbitrate at all under the contract in

question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the

scope of the arbitration agreement." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco*

*Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996); *accord Jacobs v. USA Track & Field*, 374

7

F.3d 85, 88 (2d Cir. 2004).  For purposes of this motion, there is no dispute as to the first

question — that the parties agreed to arbitrate certain disputes before Grant Thornton under the

Purchase Price Adjustment provisions of the Agreement.  Instead, insofar as those provisions

plainly "limit arbitration to specific types of disputes," *McDonnell Douglas Finance Corp. v. PA

Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988), the only relevant question is whether the

parties' disputes fall within the scope of their agreement to arbitrate.  In resolving that question,

the Court must "apply ordinary state-law principles that govern the formation of contracts."

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  In addition, however, "due

regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of

the arbitration clause itself resolved in favor of arbitration."  *Volt Info. Sciences, Inc. v. Bd. of

Trustees*, 489 U.S. 468, 475-76 (1989).  Accordingly, "unless it can be said with positive

assurance that the arbitration clause is not susceptible of a plausible interpretation that covers the

asserted dispute, the dispute should be submitted to arbitration."  *Chung v. President Enter.

Corp.*, 943 F.2d 225, 230 (2d Cir. 1991) (internal quotation marks omitted); *see Coca-Cola

Bottling Co. of N.Y., Inc. v. Soft Drink & Brewery Workers Union Local 812*, 242 F.3d 52, 56-57

(2d Cir. 2001) (compelling arbitration notwithstanding a "plausible" reading of the arbitration

clause that would have rendered the dispute non-arbitrable); *see also Chevron U.S.A. Inc. v.

Consol. Edison Co. of N.Y., Inc.*, 872 F.2d 534, 537-38 (2d Cir. 1989) ("[E]ven a narrow

arbitration clause must be construed in light of the presumption in favor of arbitration.").

## DISCUSSION

Applying the foregoing standards, the Court must grant HBC's motion and direct the

parties to proceed with arbitration before Grant Thornton.  *See McDonnell Douglas*, 858 F.2d at

830 (noting that the FAA "leaves no place for the exercise of discretion by a district court, but

instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed" (internal quotation marks omitted).  That conclusion is compelled by a straightforward reading of the Purchase Price Adjustment provisions of Agreement, which vest the Accountant with authority to determine whether the Final Purchase Price was calculated in conformity with the Accounting Principles.  First, under Section 3.3(a), Harris was required to provide to HBC the Closing Certificate prepared "in accordance with the Accounting Principles"— defined in Section 3.1(b) of the Agreement as "U.S. GAAP and, to the extent consistent with U.S. GAAP, the accounting principles and methodologies followed by [Harris] in its preparation of" its financial statements.  Second, under Section 3.3(b) of the Agreement, HBC was authorized to provide a Dispute Notice setting forth any disagreements with the Closing Certificate.  Significantly, although the Agreement set a deadline for the delivery of any Dispute Notice, it otherwise contains no exceptions or limitations on the types of disagreements that HBC could raise in a Dispute Notice.  To the contrary, HBC was authorized to provide notice of disagreements "in *any* respect with *any* item or amount showing or reflected in the Closing Certificate."  (ASA § 3.3(b) (emphasis added)).

Finally, and most importantly, the Agreement provides — again, without exception or limitation — that *all* issues raised in a Dispute Notice that have not been resolved within thirty days must be decided in arbitration by the Accountant.  Specifically, Section 3.3(c) states unambiguously that the parties "shall jointly retain Grant Thornton . . . to resolve *the issues* set forth in the Dispute Notice" that have not been resolved within thirty days.  (*Id.* § 3.3(c) (emphasis added)).  And Section 3.3(g) explicitly states that "[*a*]*ll* matters that are the subject of a Dispute Notice *shall* be conclusively settled" in accordance with the Purchase Price Adjustment provisions of the Agreement, including, if necessary, arbitration before the

9

Accountant.[1]  (*Id.* § 3.3(g) (emphasis added)).  Considering all of the foregoing provisions together, HBC's reading of the Agreement to require arbitration before Grant Thornton of the parties' remaining disputes is at minimum "a plausible interpretation" of the parties' agreement, *Chung*, 943 F.2d at 230 (internal quotation marks omitted), if not the *only* plausible interpretation.  *See, e.g.*, *Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 583-84 (S.D.N.Y. 2014) (holding, in similar circumstances, that a "dispute over the propriety of adjustments for non-compliance with GAAP [fell] well within the scope of the arbitration clause" because the agreement set "no explicit limits on the type of objections to the calculation of working capital that may be raised before the arbitrators").[2]

In arguing otherwise, Harris contends principally that this case is controlled by the New York Court of Appeals decision in *Westmoreland Coal Co. v. Entech, Inc.*, 763 N.Y.S.2d 525 (2003).  (Harris Mem. 12-21; Harris Sur-Reply 1-5).  As in this case, the buyer in *Westmoreland* raised a dispute with respect to whether the seller had complied with GAAP in calculating an adjusted purchase price, and the parties disagreed about whether that dispute was subject to arbitration under their agreement's purchase price adjustment provisions or litigation under separate indemnification provisions.  *See id.* at 527.  Reading the parties' agreement "as a

---

[1]  That is not to say that *any* claim would be arbitrable simply because HBC included it in the Dispute Notice.  There may well be claims whose link to the Purchase Price Adjustment provisions would be so attenuated that it would not be "a plausible interpretation" of the Agreement to find the claims arbitrable.  *Chung*, 943 F.2d at 230 (internal quotation marks omitted).  But that is not the case for HBC's claims here.

[2]  In support of its interpretation of the Agreement, Harris relies on a declaration describing the purported purposes of the Purchase Price Adjustment provisions.  (Harris Mem. 7 (citing Schwartz Decl. ¶ 9)).  But in the absence of ambiguity — and neither party contends there is ambiguity in the Agreement — there is no basis to look beyond the terms of the contract itself.  *See, e.g.*, *Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 656 (S.D.N.Y. 2011) ("Plaintiff's subjective intent, as articulated in his submissions, regarding the scope of the arbitration clauses is extrinsic evidence, resort to which is inappropriate . . . .").

harmonious and integrated whole," the Court of Appeals concluded that the buyer's objections "unambiguously" fell within the agreement's "indemnification provisions, not its purchase price adjustment provisions." *Id.* at 528. As the Court reasoned, the purchase price adjustment provisions did not themselves require the seller to calculate the adjusted purchase price in compliance with GAAP. Instead, they required the seller to calculate the post-closing price adjustments "'on a basis *consistent* with the preparation of'" the seller's interim financial statements, which in turn were "'based upon generally accepted accounting principles.'" *Id.* (quoting the sale agreement). Thus, in claiming that the seller had failed to comply with GAAP, the buyer was effectively challenging the seller's representations and warranties that its interim financial statements complied with GAAP. And under the explicit terms of the party's agreement, "the remedies set forth in the indemnification provisions were the parties' 'exclusive remedies' for misrepresentation of breach of any warranty contained in the Agreement." *Id.* at 527; *see also id.* at 529.

Westmoreland, however, does not stand for the proposition "that arbitration of disputes arising out of purchase price adjustments is categorically precluded irrespective of the terms of the agreement in question." *McGraw-Hill Cos. v. Sch. Specialty, Inc.*, 840 N.Y.S.2d 47, 48 (App. Div. 1st Dep't 2007). Instead, "the *Westmoreland* Court merely construed the agreement before it." *Id.*; *see Westmoreland*, 763 N.Y.S.2d at 528; *accord E*Trade Fin. Corp. v. Deutsche Bank AG*, 374 F. App'x 119, 121-22 (2d Cir. 2010) (following *Westmoreland* and distinguishing contrary district court authority by stating that "[w]e merely construe the agreement before the court" (internal quotation marks and brackets omitted)); *see also, e.g.*, *Violin Entm't Acquisition Co. v. Virgin Entm't Holdings, Inc.*, 871 N.Y.S.2d 613, 613-14 (App. Div. 1st Dep't 2009) (noting that the *Westmoreland* Court "merely construed the agreement before it and did not

prohibit sophisticated business parties from agreeing to varying means of resolving disputes over adjustments to purchase price." (internal quotation marks omitted)).  And, superficial similarities aside, the Agreement at issue here is easily distinguished from the agreement at issue in *Westmoreland* for at least two reasons.  *See Severstal U.S. Holdings, LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430, 439-44 (S.D.N.Y. 2012) (distinguishing *Westmoreland* on similar grounds); *see also Seed Holdings*, 5 F. Supp. 3d at 584 (similar).[3]

First, "the *Westmoreland* Court's concern and emphasis on consistent treatment is less salient in this instant case because here, the matter involves appropriate adjustment, not comparison." *Severstal*, 865 F. Supp. 2d at 441.  That is, the Agreement's purchase price adjustment provisions do not stress (or even demand) consistency with the accounting principles used in preparation of other financial statements.  Instead, they independently — and primarily — require compliance with U.S. GAAP.  (ASA § 3.1).  To be sure, they also require compliance with "the accounting principles and methodologies followed by [Harris] in its preparation of" its financial statements, but they do so only "to the extent consistent with U.S. GAAP."  (*Id.*).  Moreover, the purchase price adjustment provisions themselves define "the Accounting Principles," and they do so only for the purpose of calculating the final closing values and Final Purchase Price.  (*Id.* §§ 3.1, 3.3).  Notably, the Agreement does not reference the Accounting Principles in any other section, including the sections concerning Harris's representations and

---

[3]     For the same reasons, Harris's reliance on cases following *Westmoreland*, including the Second Circuit's unpublished opinion in *E*Trade*, is misplaced.  Additionally, the issue in *E*Trade* was not whether the dispute at issue fell within the parties' arbitration agreement, but rather whether the arbitration provision *barred* the indemnification claim that had been brought in that case.  *See Severstal*, 865 F. Supp. 2d at 441 (discussing *E*Trade*).  As the *Severstal* Court noted, that is a very different question than the one posed here — namely, whether there is a plausible interpretation of the parties' arbitration agreement pursuant to which a dispute would be arbitrable.  *See id.*

warranties and indemnification.  Thus, whereas the buyer's objections in *Westmoreland* were effectively objections to representations and warranties that the seller had made with respect to its underlying financial statements, HBC's objections were to Harris's calculation of the adjusted purchase price pursuant to the explicit terms of the purchase price adjustment provisions.

Second, although the Agreement in this case also provides that the remedies set forth in the indemnification provisions are the "sole and exclusive remedy for any claims (other than for fraud) made in connection with" the Agreement (*Id.* § 11.9), it differs from the agreement at issue in *Westmoreland* in one critical respect: It explicitly carves out — and in all capitals, no less — any disputes that are resolved pursuant to the Purchase Price Adjustment procedures established by Section 3.3 of the Agreement.  (*See id.* § 11.9 ("NOTWITHSTANDING THE FOREGOING, THIS ***SECTION 11.9*** SHALL NOT OPERATE TO INTERFERE WITH OR IMPEDE THE OPERATION OF THE PROVISIONS HEREOF PROVIDING FOR THE RESOLUTIONS OF CERTAIN DISPUTES BY THE ACCOUNTANT."); *see also id.* § 3.3(g) ("All matters that are the subject of a Dispute Notice shall be conclusively settled between the parties for all purposes of this Agreement (including ***Section 11.1***) pursuant to this ***Section 3.3***, and no claim may thereafter be brought under any provision of this Agreement (including ***Section 11.1***) with respect to such matters.")).  That language, no less than the absence of an exclusive-remedy provision altogether, "cannot be construed as a manifestation of intent to deprive the [Accountant] of jurisdiction over disputes about the proper accounting methodology to be used in calculating actual closing working capital."  *Seed Holdings*, 5 F. Supp. 3d at 585.  If anything, it appears to contemplate that some disputes could be pursued either through the Purchase Price Adjustment procedures or through indemnification (albeit not through both).

And because the Agreement "does not direct how such a dual-natured must be asserted, the presumption is for arbitrability." *Severstal*, 865 F. Supp. 2d at 443.[4]

Harris makes only one other argument that calls for discussion here. Citing the fact that HBC had an opportunity to conduct due diligence of Harris's accounting methods prior to the transaction (as memorialized in Section 5.7 of the Agreement), it contends that "it makes no sense that the parties would have agreed to give HBC an unlimited right to challenge those methodologies as U.S. GAAP violations under the Purchase Price Adjustment process, rather than under the exclusive (and limited) indemnification process." (Harris Mem. 18-19). That argument, however, is insufficient to override the plain terms of the parties' Agreement.[5] And while it appears to find some support in language from *Westmoreland*, *see* 763 N.Y.S.2d at 529 (reasoning that the buyer's "interpretation of the purchase price adjustment provisions would also undermine the Agreement's due diligence provisions"), that appearance is only superficial. In *Westmoreland*, as noted, the agreement required that the working capital determinations be

---

[4]     Insofar as the Agreement contemplates that some disputes may have a "dual nature" — namely, that they "are capable of being asserted as proposed post-closing adjustments or a claim for indemnification," *Severstal*, 865 F. Supp. 2d at 443 — there is no merit to Harris's argument based on HBC's submission of an indemnification claim after filing this case. (Harris Mem. 10, 17-18; Schwartz Decl., Ex. 2). That is, as other courts in this District have "consistently" held, "it is of no moment that disputes about arbitrability could also be characterized as arising under other provisions of a contract." *Seed Holdings*, 5 F. Supp. 3d at 584 (citing cases). In any event, HBC's post-petition actions are not a basis to disregard the plain language of the Agreement.

[5]     Moreover, there is some circularity to the argument. HBC presumably conducted due diligence to determine the risks involved in the transaction. To the extent that it reasonably anticipated a purchase price adjustment provision in the parties' final agreement, it may well have factored that anticipation into its assessment of risk. For similar reasons, there is no merit to Harris's reference to the fact that HBC purchased the Business after a competitive auction. (Harris Mem. 19). First, it is insufficient to override the plain terms of the parties' Agreement. Second, the other bidders, had they won the auction, might well have insisted on a purchase price adjustment process such as the one here, and pressed objections similar to those pressed by HBC; in that regard, the competing bids may well have internalized the probability of the purchase price being adjusted pursuant to objections like those raised by HBC.

calculated using the same method as the seller's earlier financial statements. *See id.* at 529. Given that, it made sense to place great weight on the buyer's due diligence; to the extent that the seller's purchase price adjustments were not compliant with GAAP, the buyer should have discovered the problem in conducting due diligence with respect to the earlier statements. By contrast, and as noted above as well, the purchase price adjustment provisions in this case independently required compliance with U.S. GAAP. Accordingly, HBC's due diligence might not have put it on notice of how Harris might calculate working capital at the time of closing. Given HBC's due diligence, the size of its objections is indeed surprising (and may well prompt scrutiny from the Accountant). But the amount in dispute, like the ultimate merits, is irrelevant to the threshold question of whether the dispute falls within the scope of the parties' agreement to arbitrate. *See, e.g.*, *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960) (stating that, in determining arbitrability, courts "have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim").

In short, much as Harris might wish that HBC's objections were subject to the limitations set forth in the indemnification provisions (including, most notably, the liability cap), it is bound by the terms of its agreement with HBC to arbitrate the remaining disputes before Grant Thornton. *See, e.g.*, *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (stating that, under New York law, "'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" (quoting *Greenfield v. Philles Records, Inc.*, 750 N.Y.S.2d 565, 569 (2002))); *see E*Trade*, 374 F. App'x at 122 (holding that a court's role in interpreting an arbitration provision is merely to construe and enforce the parties' agreement by its terms).

Having concluded that all of HBC's claims are subject to mandatory arbitration, the Court must decide whether to dismiss or stay this action pending arbitration. Although Section 3 of the FAA requires a district court to stay proceedings where an issue before it requires arbitration, *see* 9 U.S.C. § 3, a court has discretion to dismiss, rather than stay, an action when all of the issues in it must be arbitrated, *see Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 92-93 (2d Cir. 2002), because "no useful purpose will be served by granting a stay of [the] proceedings," *Germosen v. ABM Indus. Corp.*, No. 13-CV-1978 (ER), 2014 WL 4211347, at *7 (S.D.N.Y. Aug. 26, 2014) (internal quotation marks omitted). In evaluating whether to dismiss or grant a stay, however, the Second Circuit has urged district courts to be mindful of the fact that a dismissal is appealable whereas a granting of a stay is not, and "[u]nnecessary delay of the arbitral process through appellate review is disfavored." *Salim Oleochemicals*, 278 F.3d at 93. Thus, the Court will stay the proceedings pending arbitration of HBC's claims.

## CONCLUSION

The Court has considered all of Harris's other arguments and finds them to be without merit. Accordingly, and for the reasons stated above, HBC's petition to compel arbitration is GRANTED, and the case is stayed pending conclusion of the arbitration. Further, as there is no reason to keep the case open pending the arbitration, the Clerk of Court is directed to administratively close the case without prejudice to either party moving by letter motion to reopen the case within thirty days of the conclusion of the arbitration proceedings.

SO ORDERED.

Date: December 10, 2014
New York, New York

_____
JESSE M. FURMAN
United States District Judge

16